at all. Oral arguments not to exceed 15 minutes per side. Matthew Fornshell for the Appellant Cross Appellee. You may proceed. Thank you. Good morning. My name is Matt Fornshell. I'm appearing this morning on behalf of Principal Appellant Patton Wallcovering at Norwell Group. We need the light. On behalf of Patton Wallcovering at Norwell Group, as an initial matter, I ask to reserve three minutes of my time for rebuttal. Can you keep your voice up at the end of your sentences? I'm losing you. Actually, keep it up the whole time. Okay, absolutely. This is a single-issue appeal challenging the lower court's decision awarding $222,000 in lost profit damages. So all we're focused on here this morning is the earlier court's decision on awarding damages in this case. As this court is well aware, damage is a basic element of any breach of contract claim. And the reason we're not talking about liability is your client agrees that there was a breach? No, my client does not agree that there was a breach, but the court and earlier summary judgment . . . Okay, I thought that there was no longer any contesting that feature of the case. There is not a . . . we are not contesting . . . That's not part of your appeal? That's correct. Okay, right. You're just appealing the amount of damages, right? Damages only. Sadly, this is just a math case. That's exactly right. We like just a math case. Even as lawyers, just a math case. In the context of awarding lost profit damages, plaintiff must provide objective evidence establishing lost profits. And the standard is within a reasonable . . . We have to prove that the district court's award was what? We have to prove . . . What standard of review? Ellen, the standard of review here is abuse of discretion. That's your job is to show that the district court, in that math, abused its discretion. That's correct. Right? That's exactly right. I'm sorry, Your Honor. Go ahead. Are we talking about an issue . . . are we talking about findings of fact? Or are you saying there was a misapplication of law or what? I don't believe . . . I think there is both, Your Honor. In terms of an application of fact, as the court has likely seen from our briefing, the lower court made its finding on damages based on an analysis of information from a competitor of the plaintiff in this case and extrapolated their sales information from regions where they sold and superimposed that upon the plaintiff in this case as a basis for awarding damages. And there's a complete non sequitur between these two entities. The one is a large manufacturer of wallpaper located in South Korea, $60 million a year in sales. They sold in . . . But the judge only looked at sales of the relevant wallpaper. Actually, she did not. She looked at sales both of wallpaper that the plaintiff sold traditionally, which they call textured wallpaper, and I will confess I don't know exactly what that means, but textured wallpaper versus non textured wallpaper. But all of these were products of your company. All of these were products of my company, but not all of these were sold by the plaintiff in this case. But the underlying facts about the contract is that, and the judge accepted this, is that he had a contract to be able to sell the full line of wallpaper. And whether you concede that or not, that seems to me, unless I misunderstand the facts, that is a fact that the judge found. It is true that he had the ability, the right, to sell contractually all of the various collections of patent wall coverings. But remember, the standard here is the court has to find within a reasonable degree of certainty that the plaintiff would actually make these sales. The plaintiff had never made these sales and, in fact, had never requested these various collections to be sold in the past. So it's clearly an error. That's the experience of this particular agent. That's exactly right. So as your Okay, do I misunderstand the facts? I thought that he testified, and part of his claim was that he was trying to develop that business. And just when he was telling people, I have this, and please buy it, and all of that, and just when that was starting to take off, your client said, no, you don't have access to all of that. You just stick with what you were doing. I thought that was the claim, and that's what the judge accepted. I don't think that is the claim. In fact, during his testimony, Mr. Kasseri testified that over the years, he'd never been able to sell these other products, the products that Mr. Patton was no longer going to offer to him for sale. He'd never been able to sell them in the past because nobody wanted them. So he wasn't focused on them. He was focused on the products that he could always sell, which he had sold, and those were the textured products. And so as a consequence of that, it's our position that the court abused its discretion and not only looking at a company who I would suggest to the court was not a competitor. We're talking about Mr. Kasseri, who was a one-man operation operating in the back of his video store in Michigan versus a $60 million a year revenue company located in South Korea that not only had employees of roughly 150, three of which were dedicated to the Middle East, but also sold in Asia and in Africa. These are not comparable competitors. And that's the case law in Michigan. And, in fact, the court in her decision relied on the Barrow decision out of the Michigan Appellate Court that stood for that proposition that while you can look to a competitor for evidence of what lost profits might look like, that competitor has to be a similar competitor. And these, I would suggest, certainly are not. In Barrow, you had two car dealerships. Pretty easy to compare. Here, you have completely dissimilar companies. But if there isn't any comparable business there, what should the court do? Go just look at the party's profits in the last few years or anything like that? Well, clearly, that is the preferable approach is for the court to look at the objective data that would have been entered into evidence by the plaintiff in this case. That, therein, was the problem for this court, was that the evidence that was introduced by the plaintiff in this case was insufficient for the court to conclude or to be able to calculate what future loss. You know, one would think that that's what the court would look to, the prior sales, sales volume, and the production that they enjoyed before the restriction and after. That's exactly right. And in this case, the court concluded in her decision, she actually states that in response to the damages that the plaintiffs were seeking, there was insufficient evidence for her to come to any conclusion that she could be able to arrive at that number, and as a consequence. I can't help us with what was insufficient about it. I'm sure that it's all available to us, but what's insufficient? Because he's a small operator from a video store, or that he didn't have a history of sales from which she could produce some? I have to speculate a little bit because the court didn't state expressly in her opinion why that is. I can tell you based on the record why we believe that is, and we believe it's because Elite was a new company, and we make this argument in our briefing that it had only been in business since 2010. It had a very limited operating history, particularly as a distributor. Mr. Kasseri had previously been an agent for Patton through another agent called KDE, which was his father's business in Kuwait. So he worked for his father, and he sold Patton's products through them. In 2010, when KDE's agency contract ended with Patton, he developed his own relationship with Patton, and he created Elite. He created Elite, so it's a new business for him. It's a new business for him. It was a new business for Elite, and the business model is completely different. An agent, you're just selling the product. You get a commission. For a distributor, you're buying the product from the manufacturer. You're setting the price. You're having to handle all of the shipping import issues. You're taking the risk of all the fluctuations in currency and all those things, and they had an enormous impact on Mr. Kasseri. If you look at his sales numbers from 2009, his gross sales numbers were $448,000 his last year as an agent. His first year as a distributor, his gross sales numbers were $26,000. By 2011, he'd lost his largest client in Africa, ASIO Africa, in the first half of the year. ASIO reached out to Mr. Patton. They had had enough of Mr. Kasseri, and they wanted to deal directly with Mr. Patton. They did so. He lost his largest client in Africa and his other two clients in Africa. That was a breach of contract, wasn't it? As between Mr. Kasseri and ASIO Africa? No, between Mr. Kasseri and Patton. Didn't he have an exclusive for direct selling? He did not. He did not. I thought he was an exclusive agent but a distributor along with other people. So there's a distinction to be made here. But can you buy directly? Don't you have to buy from a distributor? You do not. And this is part of their cross-appeal. The distinction is this. His contract with Patton gave him two things. One was this notation of an exclusive agency as well as a distributorship. What it does not do is give him an exclusive right to sell. And under Michigan law, there is a distinction between having an exclusive agency and an exclusive right to sell. And unless the contract expressly says that the manufacturer can't sell its own product, as a consequence, it does not prevent Patton from selling its product directly. An exclusive agency. So an exclusive agency means that Mr. Kasseri would be his patent wall coverings only agent, so it's only person within a defined region who would be selling as the manufacturer's agent. What it doesn't mean is that being an agent would be to the exclusion of the manufacturer if the manufacturer wanted to make a sale directly itself. Okay, well, in any event, didn't the court find that Elite suffered damage from the breach because Elite was working to increase the sales and that the act of cutting off the new products predictably resulted in Elite's customers losing interest in taking their business elsewhere? I think that's what the court found. So isn't that a finding that Elite was working to sell these new products to new people and then by cutting off his access, you just sort of nixed all that? Well, first of all, there's no evidence in the record that he was selling to new people. Mr. Kasseri was going back to the same clients he'd always gone to, none of whom had purchased the product that Mr. Patton was restricting him from selling in August of 2011. There's zero evidence of that. In fact, Mr. Kasseri could have continued to sell and did continue to sell the products he had always sold to those clients after the breach in August of 2011. Your time has expired, Mr. Forshell. You'll have your reserved time shortly, and we'll hear from Mr. Frank now. Thank you very much. Good morning, Jonathan Frank for Elite. Let's start with kind of a basic premise of law, which is Judge Edmonds was using Michigan law as it relates to lost profits in a business case and understanding that mathematical certainty is not required, and as long as she wasn't totally speculating about damages, she was on firm ground legally. So in response, Judge White, to your question, I don't think there's a real argument that she misapplied any aspect of Michigan law. Her opinion is very clear that she is following it, and she understands what the parameters of Michigan law are when it relates to lost profit damages. But an appellate court can look to the methodology if it runs far afield. Yes. So that's, I think, as I get it, that's the argument here, that comparing apples to trucks. Yes, and that would be, just to be clear, the reason I'm raising this is in terms of the standard of review, we're not talking about a misapplication of a legal principle where the standard of review is different. We're talking about exactly your question, which is understanding the legal framework, how did she interpret the evidence and then come up with a damage? So if this had been a jury trial, the jury would have written $222,000 on its verdict form, sent it in. That would be the end of it. We would not know, probably, the mind, the working of the deliberation. Judge Edmonds gave us some hint into her thought process, and I just want to explain this is about as close to a non-hypothetical, non-speculative construct as you can come up with. Certainly, I don't agree that two-thirds was the right percentage. We presented evidence that Mr. Kasary would have sold every dollar of sales that DID sold and more. But Judge Edmonds disagreed. He never had, as a matter of history. He never got up to that point, right? I mean, he died to have an awful big operation, and he never did have that. He ran it out of a video store. Let me address the history. We know that, from the record, very clearly, Patton itself was having serious economic trouble in 2008, 9, 10, like everybody else. They were cutting off collections. They were not allowing Mr. Kasary to go to the market and sell. They weren't producing anything new. So his efforts are restricted not by his own inability to do anything, but by his manufacturer's inability to produce product. Then the economy turns around, and Patton gets a contract with a Korean manufacturer that is better for Patton to produce more stuff. So it's apples and trucks between 2008, 9, 10, and what happens finally in 2011. He's about to get the payoff for the work that he's put in, keeping his customers at whatever level. When you say he's about to, your words, then appellate judges start going, now we're thinking speculative. It's not speculative because we have DID, and this is where I'm telling you that the construct, you couldn't have a less hypothetical situation. To say that it's a large manufacturing company dwarfing Mr. Kasary ignores the fact that he's not in the manufacturing business. Take out all the millions or billions of dollars that DID makes for manufacturing, the employees it has manufacturing Korea. Those are irrelevant. It has three people on the ground in the Middle East. He has one. Not much of a difference because he, of the four. Should it matter to us that you say three and your colleagues just gave us a bigger number? I thought he said five or six. Does it matter to us? I don't think it should matter. Of all those people, he's the only one that speaks Arabic. So if you're going to compare sales efforts in the Middle East, you've got a Korean-based company with people on the ground that don't speak Arabic, as opposed to Mr. Kasary who spent his life, he's from Kuwait. He was born in Kuwait. His dad has a distribution business in Kuwait. He travels to the Middle East and speaks Arabic. So if we're going to compare sales efforts and capacity, we have somebody who's on the ground regularly speaking to the customers who's actually dealt with them. And now we have sales that are the fruit of his labor. It's to the same accounts. It's the same products. Can we talk about that? All right. Before, maybe if you give us more facts because he had two primary clients, right? Your client. Yes. His dad who he did not make a profit on and who did not then buy from DID after. And this, what's it called? Excel. Well, Asia or Africa? Asia or Africa. Right. Okay. Now, at some point in this, Asia or Africa started buying directly from Patton, but then they later went to DID? Well, the sales through Patton are the ones we're complaining about should be credited to Mr. Kasary. But, yes, that's where there was clear intervention, however you want to describe it, where Patton sidestepped Mr. Kasary, went directly to Asia or Africa, and sold there. That is a $70,000 damage claim. Okay. But you just said that DID came on picture and started selling to the same clients. And so that's what I'm trying to give away here. Okay. If you read through the transcript, and you have to understand, I guess, a little bit about the nature of commerce in the Middle East. There was this company or a couple companies that are based in Dubai that are the primary distributors or sub-distributors for the rest of the Middle East. That's Excel, Dubai. So when Mr. Kasary was going, during the time he was going, he was selling quite a bit of product through this main sub-distributor as well as others. And that's Excel? Excel, E-X-C-E-L. Excel, Dubai is the one who precipitated the break in the relationship when it proposed to Mr. Patton in the spring of 2011. Is Excel and Asia Pacific the same thing? Excel, Dubai and Asia, Africa are different. Excel, Dubai is a distributor in the Middle East, sub-distributor in the Middle East, with whom Mr. Kasary had been working. There's an e-mail in the file, and I can get it for you in the record, where Excel, Dubai proposes to Mr. Patton in the middle of 2011. This is the precipitating event, we believe. They say, hey, DID can probably sell in the Middle East. They're your manufacturer. The sales are still coming through Excel, Dubai. Mr. Patton, forgetting that he has a contract with my client, writes him an August 25th e-mail that says, sorry. Doesn't talk to him, doesn't explain himself, just says, we're cutting you off. So the sales, the judge looked at sales that DID had to the Middle East. Yes. Okay. Some of those sales were to countries that your client sold to, and some of the sales were to countries that your client did not sell to. Exactly. And the interesting point is, there's no evidence in the record that it worked in any different way than it had before. Through Excel, Dubai, as a subdistributor to the Middle East. Maybe Excel, Dubai was then able to line up an account in a different Middle Eastern country than Mr. Kasseri would have had Excel, Dubai do. Are you saying that DID's records don't show to whom they sold? They showed maybe to who they shift or to something else? We were at a huge disadvantage, Your Honor, and that's because in the discovery process, all we were given was gross figures per country. If you look at Exhibit 71, you'll see it's a spreadsheet, and I think 571 is the defendant's version of the same thing. We were given, and we were told this is all that existed, we were given information on gross numbers per country per quarter. And is that sales to the country? Sales. Well then, just tell me how a sale to, say, well, I know you both sold to Saudi. Okay, Bahrain. No, your client sold there, right? Okay, so there were a few that your client hadn't sold to. Hundreds? Yeah, that showed up on the sales report. I don't know whether that's true or not, I don't know the quantities, but I do know that the evidence at trial that Judge Edmonds was relying on was not an abuse of her discretion, was that the sales channel was essentially the same. So it all went through Excel? Most of it went through Excel. There were some one-offs where Mr. Kosseri would be able to go to an individual customer directly and sell, but the gross amount was through this main subdistributor. And Judge Edmonds had this whole picture in front of her, as well as the fact that she knew that Patton wasn't providing the detailed information that would allow anybody to do what you'd like to do, which is go to a particular account and say, where did you get your stuff and did you have a relationship with Mr. Kosseri? Judge Edmonds, she couldn't do that. Well, what about DID or Mr. Kosseri? DID, they're Korean, and the only information that we got from Patton was the relationship between DID and Patton evolved to the point that DID was sending Patton checks, like royalty checks. And in connection with the royalty check, DID was reporting to Patton how many rolls were sold in a country, not to whom. And do we know how much DID sold their rolls for? It was the same. The market was the same. Same 15. Same market out the door, same market in the door. 750, 15. Same customers, same products. And then why would the judge assume that your client would have gotten two-thirds of the sales? I think she should have said 100. I mean, there was no evidence in the record that would allow a discount. She discounted. But DID was allowed. They didn't breach a contract by letting DID distribute. They breached the contract by not letting your client distribute. He still would have had to have gone head-to-head with DID. And I'm assuming, and again, we're talking about an abusive discretion standard on a complicated lost profits analysis. I believe that the evidence at trial from Mr. Kasary, who sat there and testified for a long time in front of Judge Edmonds, convinced her that he was capable of going into that market aggressively and selling every roll that DID would have sold. I think she would have been within her discretion to find 100% given his testimony. He explained the hard work he had done in that region to keep these customers happy even when things were going badly. She obviously believed him. May I move you to one other feature that I'm focused on, and that is that the court determined that his tax returns showed that he had a 24% profit margin, and the court credited 50%. Okay, let's talk about economics. Profit margin is a number that's created in reverse when you take revenue and you subtract cost of goods sold. And at some point, if your cost of goods sold is fixed or relatively fixed and your revenue then increases and increases and increases and increases beyond what it was, your profit margin changes. So it's not the case of a widget manufacturing where it costs you a nickel to manufacture. What you're describing is a thought process that I'm not sure that's what the district court went through to assess all that. She saw the tax return number, and then did she do the figuring that you suggest? Yeah, she followed my logic. She said on every rule. Is this the argument you made to her? Yes, and the argument we made is if you buy at $750,000 and you sell at $15,000, that's 50%. If your fixed cost of the year is $50,000, which it was, that included his travel. However many rolls. Right. He wasn't incurring additional cost per roll. His cost was only 50. He would travel, mostly travel, be on the phone. That was his 50. Then he could sell a million rolls and never spend more than 50. So the theory is on every roll, he makes $7.50. We explained to her and the judge agreed. You subtract the 50,000 fixed expense that allows him to run that business. But he's not in the widget manufacturing business where every unit costs more. I appreciate your argument. So that's the argument, and I'll see it in the record. You'll see it in the record. Now, this relates to the mistake we believe Judge Edmonds made, and there are a couple. One is that in her decision, she deducted three full years of $150,000, and then she changed her mind. She issued an amended judgment because we brought to her attention that in the first of the year, 2011, Mr. Cassari had already spent his nut. So for her to reduce her number by the 50,000 again for 2011 was double counting, 50,000. She agreed with us. She issued an amended judgment. It was brought to her attention that maybe that was beyond her power under the rules. She then retracted it and went back to the first original number. In my mind, leaving that to you to correct the $50,000 mistake, which is an obvious mistake given the record. And she acknowledged that she made it. She just for some reason thought she didn't have the power to fix it. Why would he not have more travel expense if this market were truly open to him to develop new customers, to go to other places within it? Why wouldn't there be more traveling? It was essentially the same bulk of customers, the same bulk of business. Remember, all that Judge Edmonds did was give Mr. Cassari credit for basically a flatline level of sales. She wasn't doubling or tripling or quadrupling the sales, which would have required him to do more work. Yes, she was. She was giving him credit for two-thirds of DID sales to the area. That's not a flatline. That's a volume of sale that presumably would require a little more hand-holding, a little more. I think we can keep in mind the following. His tax returns actually showed income of $70,000 to $75,000 a year. Her award of $222,000 divided by three is roughly what he was earning. So it's not that there was this explosion of sales. It's $222,000 over three years. It's not a huge amount of money that she awarded him. It's $70,000 a year. So it's not that he was exploding the sales in the region, and there's no evidence in the record, Judge White, that anything more would have been required than the same level of call, the same level of travel. If you make a good sales call and a customer says, hey, this year I'll buy double, you don't have to go travel twice. You just did a better job selling that account to buy double. So there was no evidence in the record that his fixed nut of $50,000 would ever have changed. There just wasn't. The last two mistakes Judge Edmonds made was Africa. You will look in the record. There's evidence that there was lost profit in Africa, and Africa is covered by the contract, undisputed point one and two. Judge Edmonds, you can read her opinion. She missed Africa. She went to the Middle East. She counted the sales of rolls in the Middle East. She said, I'm not going to give you India because you didn't have a sales force. In our brief, we explain why she's wrong about that, but I want to talk about Africa because she doesn't say anything about Africa. She just missed the fact that she should have counted up the sales and the revenue in Africa. And as much as you brought to her attention another mistake, was this also brought to her attention? Yes. And then so she corrects one and not the other? Well, no, I'm sorry. Hypothetically. No, no, because what I did was file a motion to amend the judgment based on the obvious math error. Only the one. I wasn't asking her to reconsider the whole thing. So I'm bringing to your attention Africa. All right, and your time has expired. So thank you. Briefly, just a few points. I'd first like to address counsel's remarks regarding the sales price of DID. The contract with Mr. Patton makes very clear that its sales price is $8.50 a roll. They purchased it at $7.50. He limited their sales price to $8.50. This is the other very difficult problem for Mr. Kasseri. He's claiming, with no evidence, by the way, other than his word, he's claiming that he could sell his product at $15 per roll and had been. No evidence of that other than his testimony. That's okay if the district court wants to believe it, right? It's okay if the district court wants to believe him. The problem is with the district court's analysis and its math and the likelihood of his ability to be able to sell at $15 a roll when DID is contractually bound to sell at $8.50 from a competitive standpoint, even if Mr. Kasseri had had the ability to sell these other products, which we believe that he did not. I'm sorry. DID was contractually bound to sell rolls that they bought from Patton for $7.50, for $8.50? That's correct, Your Honor. And how about rolls that they made themselves? Rolls that they made? I'm not sure I understand the question. They're a manufacturer. Well, they would manufacture. They have a contract, right? So we're a direct seller? That's right. So they had two, quote, rolls. Right. One was to manufacture Patton's product, right? And then they also had the role of being its agent and distributor in certain regions around the world. Right. And I'm asking you, they were required to sell all of it, no matter whether they made it or whether they got it from Patton, for $8.50? Well, that's where you're losing me, Your Honor. They made everything for Patton when they entered into the contract. So everything that they made that they were selling on behalf of Patton could only be sold at $8.50 per roll. It's Section 3.7 of their contract. It's very clear. Patton wanted to restrict the sale price. Absolutely. And that was part of his problem with Mr. Kasseri. And he'd had conversations with Mr. Kasseri. This is in the record. It's in the transcript that he was concerned about the price of the product. What is Patton's interest in curtailing sales prices for its agents? Because he's concerned that if Mr. Kasseri is selling his product at $15,000, that that will hurt his ability to sell his product. Oh, he wants more sales. That's exactly right. Yes, Your Honor. Quickly, I wanted to touch on Africa. The only country in Africa Mr. Kasseri had ever made sales in was Egypt, and he'd lost all of his clients in Africa. There was no other evidence that he'd made any sales in any other country in any region of Africa, or India for that matter. Well, you say he lost his clients. That means he had them at some point. He had them at some point, and he lost all three of them. Asia, Africa, approached Patton. So he lost them in a time frame that excludes them from the calculation, in your opinion, and that's clear in the record for us. Absolutely. So the breach was in August of 2008. Asia, Africa approached Patton in June, or the testimony is in June or July of 2011. The breach was in August of 2011. The testimony in the record is that Asia, Africa approached Mr. Patton in June or July of 2011. So before the breach, they had approached him, indicating they no longer wanted to do business with Mr. Kasseri. Which means they had. They had previously. We don't dispute that, Your Honor. They fired him. They did. And he sued them subsequently, by the way. So when the judge calculated damages, looking at DID sales, did she treat Egypt as part of the Middle East or Africa? She treated Egypt as part of the region in which he sold and in which DID sold. She called it Middle East, but I think she was referring to the region. Well, let me try to phrase this again. Okay. The claim is that she gave damages with respect to the Middle East, but did not give damages with respect to Africa. She did not? That is correct. And Egypt is on the African continent, but is often regarded as the Middle East. And what I'm trying to find out is whether she included Egypt or any other countries in North Africa in the Middle East assessment of damages, or did she omit them because they were on the African continent? She only omitted them because DID. She what? She only omitted Egypt in particular because DID did not sell into Egypt. Oh. Okay. And then I have one other question because we're done with opposing counsel. What was either the judge's response or the plaintiff's response to your argument regarding the 850 parole? I'm not sure I understand the question. Okay. Your claim about the DID sales were limited to 850 parole? Yes. Okay. You're relying not on testimony but on a contract? Contract that's in the record. Okay. Was there any testimony whatsoever from DID? It was all records or somebody? There was testimony from DID as well as from Mr. Patton. The court concluded that she obviously believed credible the evidence of Mr. The testimony of Mr. Kasary that he sold at $15 parole notwithstanding that DID had a contract that said 850 parole, and she made her calculation consistent with $15 parole as opposed to 850. Just another what we would consider to be weakness and abuse of discretion in her calculation. Did either side use an expert witness on the question of damages? They did not. Okay. I didn't hear. Can you say? They did not. They did not. Thank you. All right. Thank you. We hardly ever get cases international even though they're just damages. So thank you for your arguments. Interesting case. We will consider it carefully and issue an opinion in due course.